## IN THE FEDERAL DISTRICT COURT OF EAST ST. LOUIS

| | |
|---|---|
| MEGAN WEBB, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | )   Case Number: _____ |
| GENERAL MOTORS LLC | ) |
| | ) |
| | ) |
| Serve at: | ) |
| CT Corporation System | ) |
| 208 South LaSalle Street Ste 814 | ) |
| Chicago, IL  60604 | ) |
| JURY TRIAL DEMANDED | ) |
| | ) |
| | ) |
| Defendants. | ) |

## PETITION

COMES NOW Megan Webb, by and through the undersigned counsel, and for her causes of action against Defendants General Motors Company, LLC and General Motors Holding, LLC, ("Defendants" or "GM") allege upon information and belief as follows:

## I. INTRODUCTION

1.      Since 2003, Defendants have sold millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicle's ignition switch can unintentionally move from the "run" position to the "accessory" or "off" position, resulting in a loss of power, vehicle speed, control, and braking, as well as a failure of the vehicle's airbags to deploy. Megan Webb was a passenger in a 2002 Oldsmobile Alero, which is among the affected vehicles baring VIN 1G3NL52F72C206400.

2.     Defendants began installing these ignition switch systems in models from approximately 2002 through at least 2011 and possibly later. Defendants promised that these new systems would operate safely and reliably. This promise turned out to be false in several material respects. In reality, Defendants concealed and did not fix a serious quality and safety problem plaguing its vehicles.

3.     From 2004 to the present, Defendants received reports of crashes and injuries that put Defendants on notice of the serious safety issues presented by its ignition switch system.

4.     Despite notice of the defect in its vehicles, Defendants did not disclose to consumers that its vehicles – which Defendants for years had advertised as "safe" and "reliable" – were in fact not safe or reliable.

5.     GM's CEO, Mary Barra has admitted in a video message that: "Something went wrong with our process in this instance and terrible things happened."

6.      This case arises from Defendants' breach of its obligations and duties, including Defendants' failure to disclose that, as a result of defective ignition switch design, at least 1.4 million GM vehicles had the propensity to shut down during normal driving conditions and created an extreme and unreasonable risk of accident, serious bodily harm, and death (collectively referred to as "Defective Vehicles").

7.     GM's predecessor, General Motors Corporation ("Old GM") also violated these rules by designing and marketing vehicles with defective ignition switches, and then by failing to disclose that defect even after it became aware that the Ignition Switch Defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by GM, GM also had successor liability for the deceptive and unfair

acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the Ignition Switch Defects.

8.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively, the "Ignition Switch Defects"):

a.     The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

c.     The key would switch from the "run" position to the "accessory" or "off" position without warning;

d.     The ignition switch had insufficient torque to prevent the shut down;

e.     The weight of several keys on the key ring could wear out the ignition switch; and

f.     The vehicles were not crashworthy.

9.     The Ignition Switch Defects make the Defective Vehicles unreasonably dangerous. Because of the defects, the Defective Vehicles are likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of bodily harm or death to the vehicle's occupants.

10.     The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners and their passengers to a risk of serious injury or death.

11.     For many years, GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and

maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

12.     Plaintiffs have been damaged by Defendants' misrepresentations, concealment and non-disclosure of the ignition switch defects in the Defective Vehicle as the value of the Defective vehicle has greatly diminished because of Defendants' failure to timely disclose the serious defect.

13.     Plaintiffs were also damaged by the acts and omissions of Old GM for which Defendants are liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

14.     Plaintiffs paid more for the Defective Vehicles than they would have had they known of the ignition defects or they would not have purchased the Defective Vehicles at all.

## II. JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiffs reside.

16.     This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendants pursuant to Illinois's Long Arm Statute, 735 ILCS 5/2-209. Defendants regularly conduct or solicit business and derive substantial revenue from goods used or consumed in the State of Illinois.

Furthermore, Defendants have substantial and continuing contacts with the State of Illinois sufficient for this Court to exercise general personal jurisdiction over Defendants, because, among other things, (a) Defendants regularly sell its vehicles in Illinois, (b) Defendants have production facilities in Illinois, (c) Defendants maintain business relationships with automobile dealers in Illinois, (d) Defendants regularly advertise its products in Illinois, (e) Defendants service its vehicles in Illinois, (f) Defendants finance the purchase of its vehicles in Illinois, (g) Defendants maintain business offices in Illinois, (h) Defendants transport its vehicles on Illinois highways, and (i) Defendants have a registered agent in Illinois. Additionally, Plaintiffs' claims arise out of Defendants' contacts with the state of Illinois.  In particular, Defendants' commission of tortuous acts in Illinois, Defendants' making a contract in Illinois, and its transaction of business in Illinois gave rise to Plaintiffs' claims. This court also has personal jurisdiction over Defendants because Defendants are present in the State of Illinois such that requiring an appearance does not offend traditional notions of fair play and substantial justice.

18. Venue is proper in the Southern District of Illinois pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### III. Parties

19. Plaintiff Megan Webb is and is and was at all times relevant herein a resident of Belleville, Illinois.

20. Defendant GENERAL MOTORS COMPANY, LLC is a foreign limited liability company formed under the laws of Delaware and is a resident of the State of Michigan

with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.
GM was incorporated in 2009 and on July 10, 2009 acquired substantially all assets and
assumed certain liabilities of Old GM through a Section 363 sale under Chapter 11 of the
U.S. Bankruptcy Code.

21. Among the liabilities and obligations expressly retained by GM after the
bankruptcy are the following:  From and after the Closing, Purchaser GM shall comply
with the certification, reporting, and recall requirement of the National Traffic and Motor
Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation
Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each
case, to the extent applicable in respect of vehicles an d vehicle parts manufactured or
distributed by Old GM.

22. GM also expressly assumed:

All Liabilities arising under express written warranties of Old GM that are

specifically identified as warranties and delivered in connection with the

sale of new, certified used or pre-owned vehicles or new or

remanufactured motor vehicle parts and equipment (including service

parts, accessories, engines and transmissions) manufactured or sold by

[Old GM] or Purchaser prior to or after the Closing and (B) all obligations

under Lemon Laws.

23.     Because GM acquired and operated Old GM and ran it as a continuing
business enterprise, and because GM was aware from its inception of the ignition switch
defects in the Defective Vehicles, GM is liable through successor liability for the
deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

24.     Defendant GENERAL MOTORS HOLDING, LLC ("GM") is a Delaware Corporation, and is a holding company and direct parent of GENERAL MOTORS COMPANY LLC. GENERAL MOTORS HOLDING, LLC does business in the State of Illinois.

25.     Defendants GENERAL MOTORS COMPANY, LLC, and GENERAL MOTORS HOLDING, LLC are herein collectively referred to in the Petition as "Defendants" or "GM."

## IV. FACTUAL ALLEGATIONS

**A. The Ignition Switch Defects in the 2002 Oldsmobile Alero Plaintiff was a passenger in at the time of her injuries**

26.     Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensures that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle. With respect to the Defective Vehicles, GM has failed to do so.

27.     In the Defective Vehicles, the ignition switch defects can cause the car's engine and electrical system to shut off, disabling the power steering and power brakes and causing non-deployment of the vehicle's airbags in the event of a crash.

28.     The Defective Vehicles are, therefore, unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily harm or death to the drivers and passengers of the Defective Vehicles, as well as other vehicle operators and pedestrians.

29.     On or about January 26, 2013 after failure of the ignition system and as a result of the allegations recited herein, the driver of the vehicle in which Megan Webb was a passenger lost control of his vehicle and crashed on State Street Road in Belleville, Illinois. The airbags failed to deploy upon impact because of the Ignition Switch Defect.

**B. Defendants Knew of the Ignition Switch Defects for Years, but Concealed the Defects from Plaintiffs**

30.     Alarmingly, both Old GM and GM knew of the deadly ignition switch defects and their dangerous consequences for many years, but concealed their knowledge form Defective Vehicle owners.

31.     For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy. Ms. Rose's death was the first of hundreds of deaths and injuries attributable to the ignition switch defects. Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problems.

32.     Another incident involved sixteen year-old Megan Phillips. Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees. NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact. According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they begin communicating. As she stated, "I don't understand why [GM] would wait 10 years to say something. And I want to understand it, but never will."

33.     Rather than publicly admitting the dangerous defects in its vehicles, including the 2002 Oldsmobile Alero in which Plaintiff was a passenger, Defendants attempted to attribute these and other incidents to "driver error."

34.     Defendants now admit that Old GM learned of the ignition switch defects as early as 2001. During the pre-production development of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "run" position to the "accessory" or "off" position. Old GM claimed that a switch design change "had resolved the problem."

35.     In 2003 an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. It was replaced and the matter was closed.

36.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

37.     According to GM, the PRTS engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." But after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

38.     As soon as the 2005 Cobalt hit the market (which has the same ignition system as the 2002 Oldsmobile Alero), Old GM almost immediately started getting complaints about sudden loss of power incidents, "including instances in which the key

moved out of the 'run' position when a driver inadvertently contacted the key or steering column." Old GM opened additional PRTS inquiries.

39.     Rather than disclosing the true nature of the defects and correcting them, Old GM gave customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hone design" to prevent the key ring from moving up and down in the slot "[t]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging so low as they had in the past. According to GM's records, Old GM dealers provided the key inserts to 474 customers who brought their vehicles into dealers for service. Yet there was no recall. And, not surprisingly, Old GM continued to get complaints.

**C. GM Waited until 2014 to Finally Order a Recall of the Defective Vehicle**

40.     After analysis by GM's Field Performance Review Committee and the Executive Action Decision Committee ("EFADC"), the EFADC finally ordered a recall of *some* of the Defective Vehicles on January 31, 2014.

41.     According to GM, "the dealers are to replace the ignition switch," presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

42.     In a video message addressed to GM employees on March 17, 2014, C.E.O. Mary Barra admitted that the Company had made mistakes and needed to change its processes.

43.     According to Ms. Barra, "something went terribly wrong in our processes in this instance, and terrible things happened." Barra continued to promise, "we will be better because of this tragic situation if we seize this opportunity."

44.     GM now faces an investigation by NHTSA, hearings in both the U.S.

House and Senate, and a probe by the Department of Justice.

**D. Old GM Promoted the Defective Vehicles as Safe and Reliable**

45.     On information and belief, in marketing and advertising materials, Old

GM consistently promoted the Defective Vehicles as safe and reliable.

46.     For example, one Cobalt ad promised that "side curtain airbags coupled

with OnStar makes every journey the safest possible to assure that you and your

occupants will stay safe at all times."

47.     An ad for the 2006 Solstice promises that the vehicle "[b]rings power and

defines performance."

48.     A 2003 television spot for the Saturn vehicle closed with the tagline

"[s]pecifically engineered for whatever is next." Another 2003 spot closed with the

tagline, "Saturn. People first."

49.     A 2001 print ad touting the launch of the Saturn focused on safety:

Need is where you begin. In cars, it's about things like reliability,

durability and, of course, safety. That's where we started when developing

our new line of cars. And it wasn't until we were satisfied that we added

things…

50.     Old GM made these representations to boost vehicle sales and maximize

profits while knowing that the ignition switches in the Defective Vehicles were defective.

51.     Throughout the relevant period, Old GM possessed vastly superior

knowledge and information to that of consumers – if not exclusive information – about

the design and function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

52.     Old GM never informed consumers about the ignition switch defects in the Defective Vehicles.

**E. The Ignition Switch Defects have Harmed Plaintiffs**

53.     The ignition switch defects have caused damage to Plaintiffs.

54.     At the time of the subject automobile crash on January 26, 2013, Plaintiff was a passenger in a 2002 Oldsmobile Alero Southbound on Park Road in Belleville, Illinois when the driver lost control of the 2002 Oldsmobile Alero and hit a patch causing the vehicle to flip several times. The vehicle sustained severe damage to all sides and roof, yet the airbags did not deploy. Plaintiff sustained major injures in this wreck and the driver sustained mortal injuries and was pronounced dead on the scene by the St. Clair County Sheriff's Department.

55.     To Plaintiffs' knowledge and understanding, the vehicle had not been substantially modified or changed in any material way from its initial condition as designed, manufactured, marketed and sold by Defendants, and Plaintiff was unaware of any problems or concerns with the vehicle or its components prior to the incident described herein.

56.     Despite the speed and force of the vehicle at the time of the wreck, the vehicle's airbags did not deploy upon impact.

57.     The vehicle's failure to deploy airbags upon impact was caused by the Ignition Switch Defect.

58.     The vehicle's impact in the wreck caused severe damage to the vehicle and caused multiple traumatic forces to be applied to Plaintiff's body. These forces could have been mitigated had the airbags deployed in the vehicle.

59.     The vehicle was purchased with a serious safety defect and as set forth herein, Megan Webb has sustained personal injuries as a result of the defect.

60.     Defendants admit to at least twelve deaths resulting form accidents limited to the Ignition Switch Defects in defective vehicles like the 2002 Oldsmobile Alero in which the Plaintiff was a passenger. The twelve deaths are now amongst the growing number of others injured or killed because of the Ignition Switch Defect.

61.     If Old GM or GM had timely disclosed the ignition switch defects, Megan Webb would not have been injured.

## V. SUCCESSOR LIABILITY

62.     As discussed above, GM is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

63.     GM also expressly assumed liability for Lemon Law claims in the Master Sale and Purchase Agreement of June 26, 2009.

64.     GM has successor liability for Old GM's acts and omissions in the marketing and sale of Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

        a).  GM admits that it knew of the ignition system defects from the very date of
        its formation;

        b).  GM has continued in the business of designing, manufacturing, and
        marketing vehicles, including at least some of the same vehicles as Old GM;

c).  GM retained the bulk of the employees of Old GM;

d).  GM acquired, owned, and leased real property of Old GM, including all

machinery, equipment, tools, information technology, product inventory, and

intellectual property;

e).  GM acquired the contracts, books, and records of Old GM; and

f).  GM acquired all goodwill and other intangible personal property of Old GM.

## VI. CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY

65.     Plaintiff incorporates by reference each preceding and succeeding paragraph
as though fully set forth at length herein.

66.     Defendants placed the Defective Vehicles, including the 2002 Oldsmobile
Alero, into the stream of commerce.

67.     The 2002 Oldsmobile in question was in the same defective condition at
the time of the occurrence alleged above as when it left the hands of Defendants.

68.     The 2002 Oldsmobile Alero was used in a manner reasonably anticipated.

69.     The 2002 Oldsmobile Alero was in a defective condition which rendered it
unreasonably dangerous when put to its reasonably anticipated use.

70.     Plaintiff was damaged as a direct result of the aforementioned defective
conditions which existed when Defendants sold the 2002 Oldsmobile Alero.

71.     The 2002 Oldsmobile Alero was unreasonably dangerous when put to a
reasonably anticipated use without knowledge of its defective characteristics and Plaintiff
was damaged as a direct result of the product being sold without an adequate warning.

**WHEREFORE**, Megan Webb prays judgment against Defendants General Motors under Count I in an amount which this Court deems fair and reasonable, for the cause of action to be assessed against Defendants; for pre and post judgment interests to be allowed by law; for punitive damages in an amount sufficient to punish Defendants and deter it and others from similar conduct; and for such other and proper relief the Court deems just and proper.

**COUNT II**
**NEGLIGENT MANUFACTURE, DESIGN, AND FAILURE TO WARN**

72.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

73.     At all times relevant to this petition, Defendants owed to the general public, including Plaintiff, the duty to design, manufacture, and sell, vehicles that were not defective and/or unreasonably dangerous during foreseeable use.

74.     Defendants also owed Plaintiff a duty to insure that an appropriate repair procedure for the Defective Vehicles was developed and implemented.

75.     A safer design alternative existed at the time the 2002 Oldsmobile Alero was manufactured that was both technologically and economically feasible; namely, a stronger detent plunger in the ignition switch and an algorithm that would not disable the airbags when the ignition switch moves from the "run" position while the vehicle is moving.

76.     Defendants breached their duties by manufacturing and marketing the 2002 Oldsmobile Alero in a defective and/or unreasonably dangerous condition, in that the ignition switch system was defective and unreasonably dangerous as more fully set

15

forth in earlier paragraphs. Additionally, the 2002 Oldsmobile Alero was not crash worthy.

77.     The 2002 Oldsmobile Alero was unreasonably dangerous and defective for normal, foreseeable, and reasonably anticipated use by and in the presence of the general public because of the unsafe design and defective construction as set forth in earlier paragraphs.

78.     Defendants negligently, recklessly, and willfully designed, manufactured and distributed the 2002 Oldsmobile Alero, which was dangerous and defective as more fully described in earlier paragraphs.

79.     Plaintiff alleges that Defendants knowingly failed to adequately test the 2002 Oldsmobile Alero and similarly situated models, before and during the design, production, and sale of the vehicles to the public and/or knowingly placed the unreasonably dangerous vehicle in the stream of commerce.

80.     As a direct and proximate result of the Defendants' conduct, Plaintiff sustained severe, permanent and life changing injuries.

81.     By reason of the above described negligence of Defendants, Defendants are liable to Plaintiff for all damages.

82.     Defendants conduct showed complete indifference to, or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants and others from like conduct.

**WHEREFORE**, Megan Webb prays judgment against Defendants General Motors under Count II in an amount which this Court deems fair and reasonable, for the

cause of action to be assessed against Defendants; for pre and post judgment interests to be allowed by law; for punitive damages in an amount sufficient to punish Defendants and deter it and others from similar conduct; and for such other and proper relief the Court deems just and proper.

## COUNT III
## FAILURE TO WARN OF GENERAL MOTORS

83.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth at length herein.

84.     As more fully described above, Defendants designed and/or manufactured the defective and unreasonably dangerous vehicle.

85.     The 2002 Oldsmobile Alero was further rendered unreasonably dangerous because an adequate warning about the vehicle's defect was not provided to consumers, including Plaintiff, either at or after the time that the vehicle left the control of Defendants.

86.     The 2002 Oldsmobile Alero possessed characteristics, as more fully described above, which caused damage to Plaintiff and Defendants failed to use reasonable care to provide an adequate warning of such characteristics and its danger to users and handlers of the 2002 Oldsmobile Alero.

87.     At the time of the incident that is the subject of this petition, the 2002 Oldsmobile Alero was dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics.

88.     Users or handlers of the 2002 Oldsmobile Alero did not know and should not have been expected to know of the characteristics of the vehicle that had the potential to cause enhanced injuries during foreseeable use.

89.     As a direct and proximate result of Defendants' failure to warn of the dangers of the 2002 Oldsmobile Alero, as more fully described above, Plaintiff sustained permanent injuries.

**WHEREFORE**, Megan Webb prays for judgment against Defendants General Motors, under Count IV in an amount which this Court deems fair and reasonable; for costs of this action to be assessed against Defendants; for pre and post-judgment interest as may be allowed by law; for punitive damages in an amount sufficient to punish Defendants and deter it and others form similar conduct; and for such further and proper relief as this Court deems just and proper.

### COUNT IV
### NEGLIGENT MISREPRESENTATION AND/OR FRAUDULENT MISREPRESENTATION OR FRAUD

90.     Plaintiff incorporates by reference all the preceding paragraphs as though fully set forth at length herein.

91.     Defendants represented that its product was safe for its intended use.

92.     Defendants' representations were untrue.

93.     Defendants had actual knowledge or should have had such knowledge that their products created an unreasonable risk of harm to Plaintiff.

94.     Defendants negligently and/or intentionally misrepresented or omitted this information in its labeling, promotions, and advertisements and instead advertised its

products as safe in order to avoid losses and sustain profits and such actions were willful, wanton, and malicious.

95.     As a direct result, Plaintiff has sustained personal injury including, but not limited to, economic, and noneconomic damages.

**WHEREFORE**, Megan Webb, prays judgment against Defendants General Motors under Count V in an amount which this Court deems fair and reasonable, for the cause of action to be assessed against Defendants; for pre and post judgment interests to be allowed by law; for punitive damages in an amount sufficient to punish Defendants and deter it and others from similar conduct; and for such other and proper relief the Court deems just and proper.

**COUNT V**
**FRAUDULENT CONCEALMENT**

96.     Plaintiff incorporates by reference each preceding paragraphs as though fully set forth at length herein.

97.     Defendants concealed and suppressed material facts concerning the Ignition Switch Defects, and Defendants also have successor liability for the acts of concealment and oppression of Old GM as set forth above.

98.     Defendants had a duty to disclose the Ignition Switch Defects because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles. Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

99.     Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiff.

100.    On information and belief, Defendants have still not made full and adequate disclosure and continue to defraud Plaintiffs and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

101.    Plaintiff was unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's actions were justified. Defendants were in exclusive control of the material facts and such facts were not known to the public or Plaintiff.

102.    Because of the concealment and/or suppression of the facts, Plaintiff sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had the Companies timely disclosed the ignition switch defects, and Megan Webb has sustained personal injuries.

103.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**WHEREFORE**, Megan Webb prays judgment against Defendants General Motors under Count VI in an amount which this Court deems fair and reasonable, for the cause of action to be assessed against Defendants; for pre and post judgment interests to be allowed by law; for punitive damages in an amount sufficient to punish Defendants

and deter it and others from similar conduct; and for such other and proper relief the Court deems just and proper.

## COUNT VI
## DAMAGES

104.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth at length herein.

105.    Because of Plaintiff's damages proximately caused by Defendants' conduct, Plaintiff is entitled to reasonable and proper compensation for the following legal damages:

    a.    past medical expenses and charges;

    b.    past and future physical pain and mental anguish;

    c.    past disfigurement; and

    d.    past lost wages and future lost wage earning capacity;

    e.    loss of consortium;

106.    Defendants' conduct showed complete indifference to or conscious disregard for the safety of others, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others from like conduct.

**WHEREFORE**, Megan Webb prays for judgment against Defendants for damages in an amount in excess of $75,000, her costs incurred herein, punitive damages, and for such other and further relief as the Court deems just and for a trial by jury on all issues so triable as a matter of right.

## JURY TRIAL DEMANDED

Respectfully submitted,

KRUSE LAW, L.L.C.

*/s/ Edward C. Kruse*

_____

Edward C. Kruse, MBEN # 6200421
2016 S. Big Bend
Saint Louis, MO 63117
Phone:          (314) 333-4141
Facsimile:      (314) 558-3102
*Attorney for Plaintiff*